Filed 8/23/23
*See concurring opinion*

CERTIFIED FOR PARTIAL PUBLICATION<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDRES R., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E079972 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2200411) |
| v. | OPINION |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Dorothy McLaughlin, Judge. Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II of the Discussion.

1

A.R. (Father) appeals from the juvenile court's dispositional order adjudging his son a dependent of the court and removing the child from his custody. The court also ordered reunification services for Father. On appeal, Father challenges the sufficiency of the evidence supporting the court's jurisdictional finding and the removal order. He also argues that the Riverside County Department of Public Social Services (DPSS) failed to comply with state law implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). We affirm.

We partially publish this opinion in order to address some arguments concerning our recent opinions in *In re Robert F.* (2023) 90 Cal.App.5th 492 (*Robert F.*), review granted July 26, 2023, S279743, and *In re Ja.O.* (2023) 91 Cal.App.5th 672, 680 (*Ja.O.*), review granted July 26, 2023, S280572. Both cases held that the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 (§ 224.2(b)) applies only if the child was taken into temporary custody without a warrant. (Unlabeled statutory citations are to the Welfare and Institutions Code.) We continue to agree with that holding.

BACKGROUND

I. *Detention*

Father's one-year-old son, Andres R., came to DPSS's attention in May 2022, when D.P. (Mother) called law enforcement to report domestic violence. Mother reported that Father put her in a headlock and choked her. She freed herself from the headlock and tried to call law enforcement, but Father grabbed her phone and threw it.

He then drove off. Mother put Andres and his two half-siblings in her car, which contained only one car seat, and chased Father's car. She called law enforcement during that chase. Andres and his half-siblings witnessed the altercation but were not injured.[1] Mother refused an emergency protective order.

The social worker went to the family's hotel room the following day. The family had been living at the hotel for two years. The front desk agent described Father as mean and aggressive with staff. A hotel guest said that he heard screaming inside the family's room the night before and again that morning. The social worker heard voices and a television inside the family's room, but no one answered the door for over an hour, so the social worker called law enforcement to conduct a welfare check. Father opened the door when the officers knocked on it, but he attempted to close it when he saw them. Although Father resisted the officers, they eventually arrested him. Mother closed the hotel room door and refused to open it when the officers were dealing with Father. Father yelled to Mother that she should not open the door or come outside. One of the officers got a room key from hotel staff and tried to open the door, but the key did not work. The social worker later discovered that the parents had removed the batteries from the key reader on the door.

Mother came out of the hotel room after the officers took Father away. She told the social worker that Father was upset the day before because paternal grandfather had been killed. Father "got in her face," put her in a headlock, and choked her. She had red

---

[1] Mother is not a party to this appeal, nor are the fathers of Andres's half-siblings.

marks on both sides of her neck. She allowed Father to return to the hotel room after the incident because she loved him and he lived there. She described Father as a good man and a good father, and she said that yesterday was the first time "he ha[d] ever done anything like this."

Andres's half-sister, who was nearly six years old, told the social worker that Father was mad and threw Mother across the bed. He also hit Mother with his fist, which the child demonstrated by making a fist. Mother looked scared. The child could not remember what anyone had said. She told the social worker that she had seen Father hit Mother before. Andres's half-brother, who was nearly four years old, seemed not to understand the social worker's questions and made no statements. Father refused to be interviewed for the detention report.

The social worker also reported on the condition of the family's hotel room and included photographs with the detention report. Trash and other things were all over the floor, and the room was very dark because the lights did not work. The social worker tripped twice as she was trying to navigate the room and asked Mother to open the curtains. The window had two large cracks in it, and the mirrored closet door was also cracked. The parents had divided the room by hanging a tarp across it. There were piles of boxes, bags, and other objects against every wall and a makeshift wall and a tall pile of items behind the couch. A makeshift fan was hanging from the ceiling in the bathroom, and the floor in there was also littered with trash, including acrylic paint bottles. The counter in the kitchenette area was covered with items, including a blade within the

4

children's reach. The social worker asked Mother to clean up the room as much as possible so that the children did not trip or hurt themselves.

Mother told the social worker that she did not have any Indian ancestry.[2] The worker was unable to ask Father about Indian ancestry because of his refusal to be interviewed.

DPSS applied for a protective custody warrant for the removal of the children under section 340, and the court issued the warrant on the same day. DPSS also filed a petition under section 300, subdivision (b)(1), alleging in relevant part that (1) the parents neglected Andres's health and safety because the family's residence (the hotel room) was "found in deplorable conditions," (2) Father abused controlled substances, (3) the parents engaged in ongoing acts of domestic violence in Andres's presence, and (4) Father had a criminal history, including an arrest and/or conviction for felony inflicting corporal injury on a spouse.

At the detention hearing in June 2022, Mother requested that the court issue an emergency protective order restraining Father. Her counsel stated that she did not agree to one earlier because she did not understand the request, but Mother was now "more than happy to do whatever" DPSS requested. Father objected to the request for an emergency protective order. He argued that the order was unnecessary because (1) he was in custody, and (2) the altercation was an isolated incident. Father's counsel

---

**2** "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

indicated that Father might have Cherokee ancestry, and Father filed Judicial Council form ICWA-020 (Parental Notification of Indian Status) indicating that Andres might be eligible for membership in the Cherokee tribe.

The court detained Andres from the parents and issued a temporary restraining order (TRO) protecting Mother from Father. Additionally, the court found that ICWA may apply to Andres.

II. *Jurisdiction and Disposition*

DPSS again interviewed Andres's half-sister and Mother in preparation for the jurisdiction and disposition hearings. The half-sister reported that she saw Father "roll[]" Mother "all over the bed" and choke Mother. Mother asserted that Father had never "laid a hand on" her before the choking incident and that he was upset because paternal grandfather had been murdered. She again asserted that Father had always been good to her and the children.

Father's counsel did not permit DPSS to interview him about the domestic violence allegations. However, Father answered questions about his social history and background. Father claimed to have Cherokee ancestry. Paternal grandmother reported that neither she nor paternal grandfather had Indian ancestry. Father said that he would do whatever was necessary to have Andres returned to his care. When the social worker asked about placement, Father responded: "'I don't like that they're trying to keep the kids together. I feel like my son was taken from me because of her [Mother] and her kids.'" He wanted DPSS to place Andres with paternal grandmother or paternal aunt.

6

Paternal grandmother was willing to care for Andres and his half-siblings, so DPSS submitted a resource family referral on her behalf. After Father was released from custody, he had supervised visitation with Andres twice per week.

DPSS gave Father referrals for housing assistance, random drug testing, substance abuse treatment programs, parenting education, and domestic violence services at a mental health agency. Father drug tested negative and provided proof of enrollment in parenting education, anger management, and counseling services. He also provided a letter from a substance abuse treatment program stating that he did not meet the medical requirements for treatment.

At the jurisdiction hearing in July 2022, the parents requested that the court set the matter for contest, so the court continued the hearing. With respect to the TRO, Mother asked the court to allow the TRO to expire. The court granted that requested, and the TRO expired that day.

Father continued to visit Andres twice per week for two hours and was engaging in domestic violence services. He had taken three random drug tests with negative results and failed to appear for a fourth test. DPSS was waiting for Father's substance abuse and parenting education providers to confirm his attendance at those programs.

DPSS contacted the Cherokee Nation and asked whether the parents, paternal grandparents, or Andres were enrolled members of the tribe or eligible to enroll. The tribe responded that Andres was not an Indian child in relation to the Cherokee Nation.

DPSS amended the petition to allege the family's residence was "unsafe," rather than in deplorable conditions.  The agency also amended the allegation about Father's criminal record to state that he had an arrest and/or conviction for misdemeanor inflicting corporal injury on a spouse, rather than an arrest and/or conviction for the felony offense.

The contested jurisdiction and disposition hearing occurred in August 2022.  Father's counsel argued that the court should find the allegations of unsafe living conditions to be untrue because Father was not living at the hotel and went there only to help with Andres or to pick up the child.  He also argued that there was no evidence to support the substance abuse allegation.  Counsel noted that Father had pled to misdemeanor inflicting corporal injury on a spouse, but he did not offer any specific arguments with respect to the domestic violence allegations.

The court struck the substance abuse allegation.  But it found true the allegations that (1) the family's residence was unsafe, (2) the parents were engaged in ongoing domestic violence, and (3) Father had a misdemeanor conviction for spousal abuse.  (The court also found true that Mother had an extensive criminal history and neglected the medical and educational needs of Andres and his half-siblings.)  The court took jurisdiction over Andres on the basis of the sustained allegations.

As for disposition, DPSS had placed Andres with paternal grandmother a few days before the hearing.  Father stated that he approved of Andres's placement with paternal grandmother and that he was "submitting on family reunification services."

8

The court made the required findings under section 361, subdivision (c)(1), by clear and convincing evidence and adjudged Andres a dependent of the court. It removed Andres from the parents' physical custody and ordered reunification services for both of them. The court found that DPSS had made reasonable efforts to eliminate the need for removal. The court also found that ICWA did not apply to Andres.

DISCUSSION

### I. *Sufficient Evidence to Support the Jurisdictional Finding*

Father argues that there was insufficient evidence to support the court's jurisdictional finding under section 300, subdivision (b)(1). We disagree.

Section 300, subdivision (b)(1)(A), authorizes a juvenile court to take jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" as a result of the "failure or inability of the child's parent or guardian to adequately supervise or protect the child." The statutory definition requires DPSS to demonstrate three elements by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

Section 300 generally requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing, but the court need not wait until the child is seriously injured to take jurisdiction. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) "The court may consider past events in

9

deciding whether a child presently needs the court's protection." (*In re N.M.*, *supra*, at p. 165.) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Domestic violence between a child's parents may support a jurisdictional finding "'if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm.'" (*In re L.O.* (2021) 67 Cal.App.5th 227, 239.)

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine if substantial evidence, contradicted or not, supports it. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We draw all reasonable inferences from the evidence to support the finding and review the record in the light most favorable to the court's determination. (*Ibid.*) We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding. (*Ibid.*)

As a preliminary matter, DPSS urges us to reject Father's challenge because he does not challenge the jurisdictional findings based on Mother's conduct. When the juvenile court takes jurisdiction on multiple grounds, we may affirm the court's finding of jurisdiction if any single ground is supported by substantial evidence. (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) We "'need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Ibid.*) However, we will address the merits of a challenge to any jurisdictional finding that

10

forms the basis for dispositional orders also challenged on appeal. (See *In re D.P.* (2023) 14 Cal.5th 266, 278.) That is the case here: Father challenges the dispositional order removing Andres from his custody, which is based on the sustained allegations of domestic violence and unsafe living conditions. We therefore reject DPSS's argument.

We also reject DPSS's argument that Father forfeited his substantial evidence challenge by failing to specifically contest the allegations of domestic violence. At the jurisdiction hearing, Father's counsel opened by stating that Father's "general denials continue." Counsel made specific arguments about the allegations of unsafe living conditions and the substance abuse allegation. Counsel then stated that Father was "submit[ting] on jurisdiction . . . with those arguments." But none of that forfeited Father's substantial evidence challenge. "[W]hen a parent submits or acquiesces on a particular record, 'the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved.'" (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.) And "[e]ven if the parent does not contest the state of the evidence, he or she preserves the right to challenge it as insufficient." (*Ibid.*) Father thus preserved his substantial evidence challenge.

As for the merits of the challenge, the record contains substantial evidence supporting the court's jurisdictional finding. According to Mother, Father choked her, put her in a headlock, and threw her phone. The social worker observed red marks on Mother's neck the day after the altercation. Andres's half-sister reported that Father threw Mother across the bed and hit her with his fist. The half-sister had seen Father hit

11

Mother on other occasions. Although Father had engaged in some domestic violence services by the time of the jurisdiction hearing, there was no information about his progress in those services. And Father refused to discuss the domestic violence allegations with DPSS. There was thus no evidence about what had caused Father to be violent from his perspective, whether he had any meaningful insights about the violence, or whether he had effectively resolved the issue. Instead, Father demonstrated a lack of insight about the issue when DPSS asked about placement—he said that he felt Andres was taken from him because of Mother and her children. Moreover, the parents appeared to be together still. Mother allowed Father to return to the hotel room just after the altercation. She eventually asked the court for a TRO but then asked the court to let the TRO expire. At the time of the jurisdiction hearing, both parents were still using the hotel room as their mailing address. On this record, the court could reasonably infer that domestic violence between the parents was likely to continue in the absence of court supervision.

The court could also reasonably infer that the violence between the parents placed Andres at substantial risk of serious physical harm. He and his half-siblings were present during the altercation and could have easily been injured when Father threw Mother across the bed and threw her cell phone. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [children were at risk of physical harm from domestic violence "since, for example, they could . . . be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the victim] falling against them"].) Andres also could have been injured when Mother put

12

the children in the car and chased after Father. The court did not need to wait until Andres was actually injured to take steps to protect him.

In sum, substantial evidence supports the court's jurisdictional finding based on domestic violence between the parents. We need not consider whether the evidence of unsafe living conditions also supported jurisdiction.[3] (See *In re D.P.*, *supra*, 14 Cal.5th at pp. 283-284 [validity of one jurisdictional finding against a parent renders moot any challenges to other jurisdictional findings against the same parent].)

## II. *Sufficient Evidence to Support the Removal Order*

Father also challenges the sufficiency of the evidence to support the order removing Andres from his custody. The argument lacks merit.

To order a child removed from their parents' physical custody, the juvenile court must find by clear and convincing evidence that (1) there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child in the parents' home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1).) We review those findings for substantial evidence (*In re R.T.* (2017) 3 Cal.5th 622, 633), taking into account the level of confidence that the "clear and convincing" standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995). The question before us "is whether

---

**3** In any event, Father's only argument with respect to the living conditions is that the parents were no longer living in the hotel room. Father does not cite to the record for that assertion, and our review of the record discloses no support for the claim. As noted, the parents were still using the hotel room as their mailing address. If they were living elsewhere or their living conditions had changed, the record does not reflect that.

the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at. p. 996.)

DPSS again urges us to conclude that Father forfeited his substantial evidence challenge. The agency reasons that Father forfeited the issue by "submitting on family reunification services." DPSS relies on case law holding that a parent forfeited her challenge to removal by submitting on the social worker's recommendation to remove the children. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 587-591.) We are not persuaded. Father did not say that he was submitting on the social worker's recommendation (which was removal), nor did he say that he was submitting on removal. His submission could reasonably be construed as an agreement to participate in reunification services only if the court removed Andres from his custody. We also note that in general substantial evidence challenges are not forfeited by failure to raise them in the trial court. (*In re R.V.* (2012) 208 Cal.App.4th 837, 848; *In re Javier G.*, *supra*, 137 Cal.App.4th at p. 464.) In the absence of an unequivocal statement that Father was submitting on removal or on DPSS's recommendation, we decline to find that Father forfeited his challenge to the removal order.

On the merits, however, Father's substantial evidence challenge fails. He argues that there was insufficient evidence of a substantial danger to Andres because Father was engaged in services and his attack on Mother was a one-time event. The argument ignores all of the contrary evidence and reasonable inferences supporting the removal order. Andres's half-sister had seen Father hit Mother before the most recent incident. Father attacked Mother in Andres's presence. Andres was only one year old and likely would have been unable to protect himself from any unintended consequences of such an attack, like an object thrown in his direction. Further, Father's mere participation in services did not show that there was no danger to Andres. There was no evidence that Father was benefitting from the domestic violence services, given the lack of information about his progress and his failure to discuss the issue with DPSS. And the court could reasonably infer that domestic violence remained a danger, because the parents were still in a relationship and living together. They were using the same hotel address for purposes of this case, and Mother asked the court to let the TRO expire. On the whole, substantial evidence supports the conclusion that Father's violence against Mother posed a substantial danger to Andres's physical or emotional well-being.

Substantial evidence also supports the conclusion that there were no reasonable means to protect Andres short of removal. Father proposes alternative means that he claims would have sufficiently protected Andres. He suggests that the court could have placed Andres in his custody on condition that he live with Andres at paternal grandmother's home, or the court could have allowed Mother to retain custody. Father

15

also suggests that the court could have issued a mutual stay-away order and ordered unannounced home visits by DPSS.

But the record supports a reasonable inference that alternative means would not have sufficiently protected Andres. First, section 361 requires the court to consider two options as reasonable means to protect the child: (1) removing an offending parent from the home, and (2) allowing a nonoffending parent to retain physical custody, so long as that parent presents a plan showing that they can protect the child from future harm. (§ 361, subd. (c)(1)(A)-(B).) Neither parent was nonoffending in this case, and even if they were, neither parent presented a plan about how they would protect Andres from future harm.

Second, placing Andres in Father's custody would have required Father to cooperate fully with DPSS, and Father overlooks the evidence that he and Mother were not fully cooperative with DPSS. When the social worker first visited the family home, the parents refused to open the door for over an hour. They took the batteries out of the key reader on the door so that the social worker and officers could not enter with the key provided by hotel staff. Father eventually opened the door and resisted the officers' attempts to get him out of the room. Once they did so, Father yelled for Mother to remain in the room. She only came out after the officers took Father away. Father refused to be interviewed at all for the detention report, and he refused to answer questions about the primary issue in this case—domestic violence—for the jurisdiction and disposition report.

16

Third, without any information from Father about the domestic violence or from his service provider about Father's progress, the court could not know whether the same issue would arise even if Father were living apart from Mother. Under all of these circumstances, the court reasonably concluded that there were no reasonable means to protect Andres short of removal.

Father also argues that the record does not contain sufficient evidence that DPSS made reasonable efforts to prevent or eliminate the need for removal. (§ 361, subd. (e) ["The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . ."].) In particular, he claims that DPSS failed to adequately investigate or propose alternatives to removal like those he proposes on appeal.

Section 361 requires reasonable efforts, not perfect efforts, and substantial evidence shows that DPSS's efforts were reasonable here. (*In re H.E.* (2008) 169 Cal.App.4th 710, 725 ["reasonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect"].) After the detention hearing, DPSS provided Father with referrals for housing assistance, substance abuse treatment, drug testing, parenting education, and domestic violence services. The agency also facilitated visitation between Father and Andres. But given Father's refusal to address the domestic violence with DPSS, the suggestion that the agency should have done more to investigate placement in his home is not reasonable. The court therefore did not err by finding that DPSS made reasonable efforts.

17

For all of these reasons, we conclude that substantial evidence supports the court's removal order.

## III. *No ICWA Error*

Father argues that DPSS failed to comply with its duty under state law to ask extended family members whether Andres might be an Indian child within the meaning of ICWA. He further argues that the error was prejudicial, so we must conditionally reverse the dispositional order and remand for DPSS to conduct a proper inquiry. We disagree.

DPSS and the juvenile court have an "'"affirmative and continuing duty to inquire' whether a child in a dependency proceeding 'is or may be an Indian child.'"" (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678 (*Ricky R.*), quoting § 224.2, subd. (a).) "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*Ibid.*) Father's argument concerns the duty of initial inquiry.

"The duty of initial inquiry applies in every dependency proceeding." (*Ricky R.*, *supra*, 82 Cal.App.5th at p. 678.) DPSS's "duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) In addition, "[f]ederal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.' (25 C.F.R. § 23.107(a) (2022).)" (*Ricky R.*, at pp. 678-679.) Similarly, "[s]tate law requires the court to pursue

18

an inquiry '[a]t the first appearance in court of each party' by asking 'each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child.' (§ 224.2, subd. (c).)" (*Id*. at p. 679.)

In some cases, California law requires DPSS to do more as part of its initial inquiry. Specifically, under section 224.2(b), "[i]f a child is placed into the temporary custody of a county welfare department pursuant to section 306," DPSS must ask "extended family members" about the child's Indian status.[4]

Section 306 authorizes a social worker to take a child into temporary custody "without a warrant" in emergency situations, namely, when "the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety." (§ 306, subd. (a)(2).) Peace officers may also take children into temporary custody without a warrant when similar exigent circumstances exist (§§ 305, 305.6, subd. (a)), and section 306 also permits the social worker to "[r]eceive and maintain, pending investigation," temporary custody of a child "who has been delivered by a peace officer." (§ 306, subd. (a)(1) (§ 306(a)(1)).) By contrast, section 340 provides for the issuance of protective custody warrants, and on a

---

[4] The provision states in full: "If a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306 or county probation department pursuant to [s]ection 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2(b).)

19

weaker showing than is required for a warrantless detention under section 306. (§ 340, subd. (b)(2); *Robert F.*, *supra*, 90 Cal.App.5th at pp. 500-501; *In re Adrian L.* (2022) 86 Cal.App.5th 342, 357 (conc. opn. of Kelley, J.) (*Adrian L.*).) Section 340 also "requires that '[a]ny child taken into protective custody pursuant to this section shall immediately be delivered to the social worker,' who must then conduct an investigation 'pursuant to [s]ection 309.'" (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 680.)

Father contends that DPSS was required to ask various extended family members about Andres's Indian status as part of the agency's initial inquiry. But DPSS took Andres into protective custody pursuant to a warrant. The child was not placed into temporary custody pursuant to section 306, so the expanded duty of initial inquiry under section 224.2(b) did not apply. (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 497-498, 500, 504.) For that reason, Father has not shown ICWA-related error by either DPSS or the juvenile court.

That conclusion follows from a straightforward application of *Robert F.*, in which this court held that the expanded duty of initial inquiry under section 224.2(b) applies only if the child was placed into temporary custody without a warrant. (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 497, 504.) *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*) recently declined to follow *Robert F.* and held that "there is only one duty of initial inquiry, and that duty encompasses available extended family members no matter how the child is initially removed from home." (*Id.* at p. 962.) For the reasons given below,

20

we do not find *Delila D.*'s analysis persuasive. Nor are we persuaded by the additional arguments in the concurring opinion.

A. *Section 306(a)(1) Does Not Apply to Removals Pursuant to Warrants*

*Delila D.* claims that when a peace officer takes a child into protective custody pursuant to a warrant and delivers the child to a social worker (§ 340, subds. (b)-(c)), the social worker receives and maintains temporary custody of the child under section 306(a)(1), so the expanded duty of initial inquiry under section 224.2(b) applies. (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 971-972.) We discussed that claim in *Ja.O.* and rejected it for various reasons, including that it would render most of subdivision (c) of section 340 surplusage. (*Ja.O.*, *supra*, 91 Cal.App.5th at pp. 679-680; see *People v. Valencia* (2017) 3 Cal.5th 347, 357 ["'[a] construction making some words surplusage is to be avoided'"].) The majority opinion in *Delila D.* never cites *Ja.O.* and does not address its analysis.

Moreover, *Delila D.* subtly misdescribes and consequently misinterprets the language of section 306(a)(1). According to *Delila D.*, section 306(a)(1) "authorizes the social worker to 'receive' the child and 'maintain' them in temporary custody." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 971.) But that is not what section 306(a)(1) says. Rather, section 306(a)(1) authorizes the social worker to "*[r]eceive and maintain*, pending investigation, *temporary custody* of a child who is described in Section 300, and who has been delivered by a peace officer." (Italics added.) Thus, under the plain language of section 306(a)(1), "temporary custody" is what the social worker receives and maintains

21

but does not initiate. Consequently, the child must already be in temporary custody before the child is delivered by the peace officer.

The only statutes that authorize peace officers to take children into "temporary custody" are sections 305, 305.6, and 625, all of which concern taking children into "temporary custody" *without a warrant*. (§ 305 ["Any peace officer may, without a warrant, take into temporary custody a minor" under specified circumstances]; § 305.6 ["Any peace officer may, without a warrant, take into temporary custody a child" under specified circumstances]; § 625 ["A peace officer may, without a warrant, take into temporary custody a minor" under specified circumstances].) In contrast, section 340 concerns the issuance of a "protective custody warrant," pursuant to which a child is taken into "protective custody." (§ 340, subds. (a)-(c).)

*Delila D.* does not articulate any reason to think that the Legislature's decision to use different terms—"temporary custody" and "protective custody"—in those statutory provisions was arbitrary or meaningless. It was not. When section 306(a)(1) was originally enacted in 1971, it was codified as section 625.5. (Stats. 1971, ch. 641, § 4; see Notes, Deering's Ann. Welf. & Inst. Code, foll. § 306 [noting that § 306 is derived from former § 625.5].) Protective custody warrants did not exist in 1971. Instead, at that time the juvenile court law provided for the issuance of *arrest warrants* for dependent minors. (Former § 663; Stats. 1963, ch. 1761, § 4.) But then-section 625.5 did not say anything about social workers receiving children who were arrested pursuant to warrants. Rather, then-section 625.5 provided, just as section 306(a)(1) provides now, that the

22

social worker could "receive and maintain, pending court hearing, temporary custody of a minor under 18 who is described in Section 600, and who has been delivered by the probation officer."[5] If the Legislature had wanted then-section 625.5 to apply to children arrested pursuant to warrants in addition to children taken into "temporary custody" without warrants, it would have said so. The relevant statutory language, now codified in section 306(a)(1), has been reenacted without substantive change ever since, always referring to "temporary custody" alone. (See Stats. 1976, ch. 1068, §§ 7, 25 [repealing former § 625.5 and reenacting its provisions as § 306].) There is no reason to believe that the meaning of "temporary custody" has changed.

Moreover, there is a fundamental difference between being arrested pursuant to a warrant and being taken into temporary custody without a warrant: An individual arrested pursuant to a warrant must be brought before a court (Pen. Code, §§ 814, 848), but both in 1971 and today, a child taken into temporary custody without a warrant may be released without first having been brought before a court (former §§ 514 [Stats. 1971, ch. 641, § 2], 626 [Stats. 1963, ch. 1486, § 1], 628 [Stats. 1971, ch. 1729, § 2]; §§ 307, 309). Thus, a warrantless detention is temporary in a way that an arrest pursuant to a

---

[5]     At the time, the same set of statutes governed delinquency and dependency cases. (*In re Malinda S.* (1990) 51 Cal.3d 368, 380, fn. 11.) Former section 600 described children within the jurisdiction of the dependency court. (Stats. 1971, ch. 1729, § 1.) In addition, at that time another statute provided that a peace officer who took a child into temporary custody must either release the child (with or without a notice to appear before the probation officer) or deliver the child to the probation officer. (Former § 626; Stats. 1963, ch. 1486, § 1.) That appears to be why former section 625.5 referred to temporary custody of a child delivered by a "probation officer" even though former section 625 authorized a "peace officer" (not a "probation officer") to take a child into temporary custody in the first place (Stats. 1971, ch. 1730, §§ 1, 2).

23

warrant is not—a child taken into custody without a warrant can be released at any time, but someone arrested pursuant to a warrant must be held until they are brought before a court (or the time to do so expires (Pen. Code, § 825)). Accordingly, it made sense for the Legislature in 1971 to use the term "temporary custody" in then-section 625.5 (now § 306(a)(1)) to refer only to the "temporary custody" (i.e., warrantless removal) authorized by then-section 625 (Stats. 1971, ch. 1730, §§ 1, 2) (now § 305).

When the Legislature amended section 340 in 1987 to replace arrest warrants with "protective custody" warrants, the Legislature did not amend section 306(a)(1) to include "protective custody." (Stats. 1987, ch. 1485, §§ 13, 29.) Rather, section 306(a)(1) continued and continues to refer only to "temporary custody," that is, to the warrantless removals authorized and referred to as "temporary custody" elsewhere in the code. But in 2002, when the Legislature enacted then-section 305.5 (now § 305.6) to create a new basis for peace officers to remove children without a warrant, the Legislature used the term "temporary custody," thereby bringing such removals within the scope of section 306(a)(1). (Stats. 2002, ch. 920, § 2.)

The history of those enactments confirms that the Legislature chooses its words with care. When the Legislature authorized law enforcement to conduct warrantless, predetention removals in child welfare cases, it referred to them as "temporary custody," distinguishing them from arrest pursuant to arrest warrants. When the Legislature authorized child welfare agencies to receive children detained by law enforcement, it used the term "temporary custody" and said nothing about arrest, thus limiting the

24

authorization to warrantless removals. (Children arrested pursuant to arrest warrants would presumably be brought before a court, which would then make orders concerning their custody.) When the Legislature created a new and different warrant process, it used the term "protective custody," thus distinguishing it from arrest but also distinguishing it from the "temporary custody" of warrantless removal. But when the Legislature later created a new and different basis for warrantless removal, it again used the term "temporary custody," bringing the new form of warrantless removal within the scope of the prior authorization for social workers to receive and maintain temporary custody of children detained by law enforcement without a warrant.

For all of these reasons, we conclude that *Delila D.*'s claim that section 306(a)(1) applies to removals pursuant to warrants is inconsistent with the plain language of the statute. Section 306(a)(1) applies and has always applied only to the "temporary custody" of a warrantless predetention removal, not to the "protective custody" of removal pursuant to a protective custody warrant.

In addition, we conclude that *Delila D.*'s reasoning in support of its position is unsound. *Delila D.* appears to reason that section 306(a)(1) must encompass removals pursuant to protective custody warrants because otherwise there would be no statutory directive for detention hearings for children removed pursuant to warrants. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 972.) We find the argument unpersuasive because (1) if it were sound, then it would be just as problematic for *Delila D.*'s interpretation as for

25

*Robert F.*'s, but also (2) it is unsound because there is an independent statutory requirement for detention hearings for children removed pursuant to warrants.

*Delila D.*'s argument is based on section 315, which states that "[i]f a child has been *taken into custody under this article* and not released to a parent or guardian, the juvenile court shall hold a hearing (which shall be referred to as a 'detention hearing') to determine whether the child shall be further detained." (Italics added; see *Delila D.*, *supra*, 93 Cal.App.5th at p. 972.) Sections 315 and 306 are in article 7 of the juvenile court law, but section 340 (providing for protective custody warrants) is in article 8. (Welf. & Inst. Code, div. 2, pt. 1, ch. 2, arts. 7, 8.) Thus, even under *Delila D.*'s interpretation of the statutes, a child who is removed pursuant to a warrant is *taken* into custody under article 8 (not article 7) and is then *maintained* in custody under article 7. (*Delila D.*, at p. 971 ["When a child is removed by warrant, the taking is authorized by section 340, and the holding or maintaining in custody is authorized by section 306, subdivision (a)(1)"].) Consequently, *Delila D.*'s interpretation gives rise to the same putative problem as *Robert F.*'s—section 315 does not require detention hearings for children taken into custody pursuant to protective custody warrants, because such children are not taken into custody under article 7.

But there actually is no problem, because section 315 is not the only statutory directive to hold a detention hearing. Section 290.1 requires a detention hearing regardless of whether the child is taken into custody under article 7 or article 8. Section 290.1 provides that if the "social worker determines that the child shall be retained in

26

custody," then the worker shall immediately file a dependency petition with the clerk of the juvenile court, "who shall set the matter for hearing on the detention hearing calendar." The concurring opinion states that section 290.1 is not a directive to hold a detention hearing, but it does not address that mandatory language requiring the matter to be set for a detention hearing. (Conc. opn., *post*, at pp. 4-5.)

In sum, we are not persuaded by *Delila D.*'s claim that section 306(a)(1) applies to children taken into custody pursuant to protective custody warrants. *Delila D.* fails to address *Ja.O.*'s arguments against that claim, and *Delila D.*'s own argument in support of the claim is, in our view, unsound.

B. *The Duty Imposed by Section 224.2(b) Is Limited to Warrantless Removals*

*Delila D.* concludes that even if section 306 concerns only warrantless removals, the duty of inquiry under section 224.2(b) is not limited to such removals because section 224.2(b) "does not state that the inquiry it describes applies 'only if' a child is taken into temporary custody under section 306." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 974.) *Delila D.* further asserts that, in addition to not containing the word "only," section 224.2(b) does not contain "any other language suggesting an intent to limit the inquiry it describes" (*Delila D.*, at p. 974), even though section 224.2(b) begins with the words "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307." Thus, according to *Delila D.*, when the Legislature said "If the following condition is met, the social worker has a duty of inquiry," what the Legislature meant was "If the following condition

27

is met, the social worker has a duty of inquiry, but if the condition is not met, the social worker still has the same duty of inquiry anyway."

That interpretation is not reasonable. The first clause of the provision—if a child is placed into the temporary custody of the child welfare department pursuant to section 306 or the probation department pursuant to section 307—sets forth the condition that triggers the duty described in the remainder of the provision. Section 224.2(b) does not describe any other conditions that trigger that duty. (Nor do any other parts of the statutory scheme describe another condition that triggers it.) Thus, the duty is triggered only by the stated condition, because the Legislature did not articulate any others. No other commonsense reading of the provision is possible. (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1157 [we must give statutory language "its plain and commonsense meaning"].)

Other parts of the statutory scheme illustrate the point: The duty of further inquiry is triggered "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding." (§ 224.2, subd. (e).) The word "only" does not appear in subdivision (e) of section 224.2, but the provision cannot be reasonably interpreted as requiring further inquiry in every case, regardless of whether there is reason to believe that an Indian child is involved. Likewise, the duty to provide notice to the tribes is triggered "[i]f the court, a social worker, or probation officer knows or has reason to know . . . that an Indian child is involved." (§ 224.3, subd. (a).) Subdivision (a) of section 224.3 does not contain the word "only," but the provision cannot be

28

reasonably interpreted as requiring notice in every case, regardless of whether there is reason to know that an Indian child is involved.

Like the provisions regarding further inquiry and notice, the first sentence of section 224.2(b) specifies the circumstances triggering the duty described in the remainder of the provision. Section 224.2(b) cannot reasonably be interpreted as requiring inquiry of extended family members regardless of whether the child was placed into temporary custody under section 306 or 307.

That said, section 224.2(b) does *not* mean that social workers are *allowed* to ask extended family members about Indian ancestry only if the child was placed into temporary custody under section 306 or 307. Rather, social workers are allowed to inquire of extended family whenever they wish. Moreover, the "affirmative and continuing duty to inquire" under subdivision (a) of section 224.2 will sometimes require inquiry of at least some extended family members, depending upon the circumstances of the case. (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 503-504.) In both of those ways, the introductory clause in the first sentence of section 224.2(b) does not limit extended family member inquiry at all—extended family member inquiry is always permitted and sometimes independently required. The introductory clause in section 224.2(b) means only that section 224.2(b) *itself* does not *require* inquiry of *all* available extended family members in *every* case.

*Delila D.* does not explain what purpose the first sentence of section 224.2(b) serves if it does not specify the circumstances in which the expanded duty of initial

29

inquiry described in the second sentence is triggered.  It is not there to impose the duty of initial inquiry on child welfare departments:  The Legislature already imposed that duty when it codified the "affirmative and continuing duty to inquire" in 2006.  (Former § 224.3, subd. (a); Stats. 2006, ch. 838, § 32; *In re W.B.* (2012) 55 Cal.4th 30, 53.)  Nor is it there to specify when the duty of initial inquiry arises:  Subdivision (a) of section 224.2 already provides that it "begins with the initial contact."

Moreover, it is "not appropriate to treat the second sentence of section[ 224.2(b)], as a generic definition of 'inquiry' that the Legislature intended to govern all ICWA inquiries, not just ones referenced in the immediately preceding sentence." (*Adrian L.*, *supra*, 86 Cal.App.5th at pp. 367-368, fn. omitted (conc. opn. of Kelley, J.).)  The statutory scheme "includes a set of generally applicable definitions."  (*Id.* at p. 368, citing § 224.1.)  If the Legislature had intended the second sentence of section 224.2(b) to prescribe what must be done for every inquiry, then "one would expect that the term would have been defined as such in the generally applicable definitions."  (*Ibid.*)  And if the Legislature did not believe that "inquiry" warranted treatment as a formally defined term but still wanted comprehensive extended family member inquiry to be universally required, then the Legislature would have included it "in one of the inquiry provisions that applies in every case (e.g., § 224.2, subd. (a)), rather than placing it immediately following the narrow mandate of the first sentence" of section 224.2(b). (*Adrian L.*, at p. 368 (conc. opn. of Kelley, J.).)

30

*Delila D.* effectively deletes the conditional language in section 224.2(b) because the provision was enacted as part of remedial legislation, Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (Assembly Bill 3176), and we should construe such legislation broadly to achieve its purpose. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 974.) But the principle that we should construe remedial legislation broadly is not a license to ignore the plain language of the statute. "Even where legislation is remedial in character and subject to a liberal construction to effectuate its purpose, the qualifying requirements of the legislation must still be enforced." (*Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd.* (2009) 175 Cal.App.4th 1074, 1093.)

*Delila D.* also cites the Legislative Counsel's digest of Assembly Bill 3176 for the proposition that the "obvious purpose" of the bill was to expand the scope of the initial inquiry beyond the parents. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 974.) The digest does not support *Delila D.*'s interpretation of section 224.2(b). The digest stated that Assembly Bill 3176 "would revise the specific steps a social worker, probation officer, or court is required to take in making an inquiry of a child's possible status as an Indian child." (Stats. 2018, ch. 833.) Consistent with that description, Assembly Bill 3176 revised the duty of inquiry under California law in a number of ways. The bill added the requirement that "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing" about the child's potential Indian ancestry. (Stats. 2018, ch. 833, § 5; § 224.2, subd. (c).) It also added the duty of the court and the social worker to "make further inquiry" if there is reason to believe that an Indian child is

31

involved, and it prescribed a number of steps for that further inquiry. (Stats. 2018, ch. 833, § 5; § 224.2, subd. (e).) And it added the provision at issue here, the duty of the child welfare department to inquire of extended family members and others if the child is placed into the department's temporary custody pursuant to section 306. (Stats. 2018, ch. 833, § 5; § 224.2(b).) It is true that all of those amendments revised (and expanded) the steps that the social worker or court must take in making an ICWA inquiry. But it is unclear why that means we should ignore the limiting language of section 224.2(b).

*Delila D.* also relies on certain statements in the California ICWA Compliance Task Force, Report to the California Attorney General's Bureau of Children's Justice. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 967.) The task force report does not shed light on the Legislature's intent with respect to section 224.2(b), because there is no evidence in the legislative history that the Legislature considered the task force report when enacting Assembly Bill 3176. That point was made and extensively documented in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1011-1012 and reiterated in the concurring opinion in *Adrian L.*, *supra*, 86 Cal.App.5th at page 370 (conc. opn. of Kelley, J.), but *Delila D.* never addresses it.

For all of these reasons, we continue to agree with *Robert F.* and *Ja.O.* that the expanded duty of initial inquiry imposed by section 224.2(b) is triggered only by warrantless removals, and we are not persuaded by *Delila D.*'s contrary reasoning.

C. *The Federal Guidelines Recommend Extended Family Inquiry for Warrantless Removals*

*Delila D.* rejects *Robert F.*'s conclusion that the Legislature intended section 224.2(b) "to track federal guidelines for implementing ICWA (the Bureau of Indian Affairs (BIA) guidelines), which recommend initial inquiry of extended family members in emergency situations but not in all cases." (*Robert F.*, *supra*, 90 Cal.App.5th at p. 502; *Delila D.*, *supra*, 93 Cal.App.5th at p. 973.) The BIA guidelines state: "It is recommended that the State agency ask the family and extended family whether the child is a Tribal member or whether a parent is a Tribal member and the child is eligible for membership as part of the emergency removal and placement process." (U.S. Dept. of the Interior, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) (BIA guidelines), at p. 28, available at <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf>.) *Delila D.* asserts that *Robert F.* "misconstrues the definition of an emergency removal under both the federal regulations and California law." (*Delila D.*, at p. 973.) *Delila D.* further asserts that an "emergency removal is the *court's order* detaining the child at the detention hearing." (*Ibid.*) We are not persuaded, because *Delila D.* fails to identify any error in *Robert F.*'s interpretation of the guidelines and does not provide an alternative interpretation.

Neither ICWA itself nor the federal regulations implementing it contain a definition of the term "emergency removal," and *Delila D.* cites none. (See 25 C.F.R.

33

§ 23.2 (2023).) The regulations define the term "emergency proceeding," but it just "means and includes any court action that involves an emergency removal or emergency placement of an Indian child." (25 C.F.R. § 23.2 (2023).) That definition thus presupposes that the concept of an emergency removal is prior to and independent of the concept of an emergency proceeding—if an emergency removal were simply a removal ordered at an emergency proceeding, then the definitions would be circular.

The BIA guidelines recommend inquiry of extended family members for emergency removals. (BIA guidelines, at p. 28.) The question is what the guidelines mean by the term "emergency removal," which the guidelines (like the federal regulations) do not define. Another section of the guidelines, entitled "Threshold for removal on an emergency basis," appears to provide the answer. (*Id.* at p. 23, boldface omitted.) The first paragraph of that section states that removal at an emergency proceeding—which by definition must be a court action (25 C.F.R. § 23.2 (2023))—is allowed "only if the child faces 'imminent physical damage or harm.'" (BIA guidelines, at p. 23.) The second paragraph of the same section explains that a state official may take a child into custody "without court authorization or parental consent only in emergency circumstances," which "[c]ourts have defined . . . as 'circumstances in which the child is immediately threatened with harm,' including when there is an immediate threat to the safety of the child, when a young child is left without care or adequate supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." (*Id.* at pp. 23-24.) That paragraph thus appears to define an

34

emergency removal (as opposed to an emergency proceeding, which itself is defined in terms of emergency removal) as follows:  It is a removal without court authorization (and hence without a warrant) that is justified by an immediate threat to the child's safety.  The standard for warrantless removals under California law is in accord.  (See § 305, subd. (a) ["the minor has an immediate need for medical care, or the minor is in immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety"]; § 306, subd. (a)(2) ["the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety"].)

Because the BIA guidelines define an emergency removal as a warrantless removal justified by an immediate threat of harm, when the guidelines recommend extended family member inquiry for emergency removals, they are recommending it for warrantless removals.

*Delila D.* does not offer an alternative interpretation of the BIA guidelines' recommendation.  Instead, *Delila D.* notes that according to section 315, the detention hearing is considered an emergency removal under ICWA when the case involves an Indian child.  (*Delila D.*, *supra*, 93 Cal.App.5th at p. 973.)  But again, the question is what *the BIA guidelines* mean by the term "emergency removal" when the guidelines recommend extended family member inquiry for emergency removals.  State law tells us nothing about that.  *Delila D.*'s argument therefore fails to persuade.

35

In sum, *Robert F.*'s interpretation of the BIA guidelines as recommending extended family member inquiry for warrantless removals appears to be well supported, *Delila D.* does not identify any error in *Robert F.*'s interpretation, and *Delila D.* does not offer an alternative interpretation.

D.  *The Federal Guidelines' Recommendation Is Reasonable*

*Delila D.* reasons that "it simply doesn't make sense to apply different initial inquiries depending on how the child was initially removed from home, as that procedural happenstance has nothing to do with a child's ancestry." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975.)  We have previously addressed that point too:  "[B]ecause warrantless detentions trigger various time-sensitive ICWA-related requirements that are otherwise inapplicable (§ 306, subd. (d)), it makes sense in such cases to expand the duty of initial inquiry—confirming whether the child in such a case is an Indian child is particularly urgent." (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 681, citing *Robert F.*, *supra*, 90 Cal.App.5th at pp. 501-502.)  Moreover, as already explained, the Legislature created an expanded duty of initial inquiry for warrantless detentions because that is what the federal guidelines recommend.  (*Robert F.*, at pp. 502-503.)  And there is a sensible reason for the recommendation in the BIA guidelines.

Congress enacted ICWA because of a rising concern in the mid-1970's about "child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes." (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.)  The long history of the "widespread removal of Indian children from

36

their families and communities" dates back to the 1800's, when the federal government established Indian boarding schools. (Jacobs, *Remembering the "Forgotten Child": The American Indian Child Welfare Crisis of the 1960s and 1970s* (2013), 37 Am. Indian Q. 136, 139 (hereafter Jacobs); U.S. Dept. of Interior, Office of Asst. Secretary–Indian Affairs, Federal Indian Boarding School Initiative Investigative Report (May 2022) (Indian Boarding School Report) pp. 3, 6.) A force called the "Indian police" supported the forcible removal of Indian children and their placement in boarding schools. (Indian Boarding School Report, at p. 29.) For instance, in the late 1800's, one federal agent described how the Indian police abducted Apache children. (*Ibid.*) The chiefs had declared that there were no children suitable for boarding school in their camps, so the Indian police "'visit[ed] the camps unexpectedly,'" chased and seized the children, and took them away, "'willing or unwilling.'" (*Ibid.*) Decades later, a witness described "'kid-catching'" on a Navajo reservation. The Navajos hid "their children at the sound of a truck," so "stockmen, Indian police, and other mounted men" were sent to round up the Navajo children. (Coolidge, *"Kid Catching" on the Navajo Indian Reservation* in The Destruction of American Indian Families (Unger edit., 1977) p. 18.) The children were "caught, often roped like cattle, and taken away from their parents." (*Ibid.*) Such "'child-snatching was a common practice until the 1930's.'" (Lacey, *The White Man's Law and the American Indian Family in the Assimilation Era* (1986) 40 Ark. L. Rev. 327, 359 (hereafter Lacey).)

"[T]he increased fostering and adoption of Indian children in the 1960s and 1970s represent[ed] both a direct legacy" of the earlier boarding school policy "and a new reiteration of Indian child removal." (Jacobs, *supra*, 37 Am. Indian Q. at p. 139.) Social workers often took Indian children from their homes without due process or "an adjudicatory process at all." (H.R.Rep. No. 95-1386, 2d Sess., p. 11 (1978) (House Report), reprinted in 1978 U.S. Code Cong. & Admin. News, at p. 7533; Lacey, *supra*, 40 Ark. L. Rev. at p. 376.) In the lead-up to ICWA, one witness before a federal commission testified: "'I can remember (the welfare worker) coming and taking some of my cousins and friends. I didn't know why and I didn't question it. It was just done and it had always been done.'" (House Report, *supra*, at p. 8 & fn. 2, 1978 U.S. Code Cong. & Admin. News, at pp. 7530-7531.)

That long and dark history of removing Indian children without due process or any kind of court involvement or oversight provides a sensible reason to recommend a more expansive ICWA inquiry when today's social workers remove children without court authorization. Under the Fourth and Fourteenth Amendments, removals without court authorization require parental consent or exigent circumstances. (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 679.) That is, without parental consent, there must be "'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" (*Ibid.*) Often, such exigent circumstances arise when the parents are not present. Indeed, parental absence is one of the criteria for warrantless removal under both the BIA

38

guidelines and California law.  (BIA guidelines, at p. 24 [warrantless removal is permitted "when a young child is left without care or adequate supervision"]; § 305, subd. (a) [warrantless removal is authorized if "the fact that the child is left unattended poses an immediate threat to the child's health or safety"].)  The BIA reasonably recommended that when warrantless, emergency removals occur, the ICWA inquiry should not be limited to the (often absent) parents but must be directed to whatever extended family members are available.[6]

E.  *Rule 5.481(a)(1) of the California Rules of Court Conflicts with Legislative Intent*

*Delila D.* disagrees with *Robert F.* because rule 5.481(a)(1) of the California Rules of Court requires inquiry of "extended family members" and does not limit that duty to cases in which a child is placed into temporary custody pursuant to section 306 or 307. (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 966, 975.)  But the history of the amendments that added that language to the rule shows that the Judicial Council intended merely to conform the rule to section 224.2(b).  The invitation to comment on the proposed amendments stated that the amendments would add "extended family members and

---

[6]    We also note that *Delila D.*'s argument on this point—"it simply doesn't make sense to apply different initial inquiries depending on how the child was initially removed from home, as that procedural happenstance has nothing to do with a child's ancestry" (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975)—appears to be a non sequitur.  As the foregoing discussion illustrates, circumstances such as the absence of the parents can have consequences for the appropriate ICWA *inquiry* even if they have no bearing on a child's ICWA *status*—the presence or absence of the parents is irrelevant to the ultimate determination of whether the child is an Indian child within the meaning of ICWA.

others who have an interest in the child, including a party reporting child abuse or neglect, to those who must be asked whether or not the child may be an Indian child." (Judicial Council of Cal., Tribal Ct.–State Ct. Forum, and Family and Juvenile Law Advisory Com., Invitation to comment SPR19-42 (2019), p. 4.)[7]  The invitation to comment cited section 224.2(b) as the sole authority for that amendment.  (*Id*. at p. 4, fn. 6.)

When the Judicial Council later considered and approved the amendments to the rule, the report to the Judicial Council from the relevant advisory committees described the amendments in the same way:  The report explained that the amendments would add extended family members and others who have an interest in the child, including the reporting party, to those who must be asked about potential Indian ancestry, and the report again cited section 224.2(b) as the sole authority for that amendment.  (Judicial Council of Cal., Tribal Ct.–State Ct. Forum, and Family and Juvenile Law Advisory Com. Rep., Appendix B, p. 270 & fn. 1.)[8]

"The Judicial Council may promulgate rules for juvenile proceedings.  (§ 265.) But where a rule is inconsistent with the legislative intent, it will be disapproved."  (*In re Jesus J*. (1995) 32 Cal.App.4th 1057, 1060.)  The Legislature expressly limited the expanded duty of initial inquiry to cases in which a child is placed into temporary

---

[7]     The invitation to comment is available at https://www.courts.ca.gov/documents/ spr19-42.pdf.

[8]     The report to the Judicial Council is available at https://jcc.legistar.com/ View.ashx?M=F&ID=7684873&GUID=52B4C6B1-F704-458F-BF42-EB1AA4F82000.

40

custody pursuant to section 306 or 307. (§ 224.2(b).) The Judicial Council intended to conform the rule of court to section 224.2(b) but neglected to incorporate the limitation imposed by the statute. To the extent that rule 5.481(a) of the California Rules of Court applies the expanded duty of initial inquiry beyond the limits imposed by the Legislature, it is inconsistent with legislative intent and is disapproved. (*In re Jesus J.*, *supra*, at p. 1060 [because the Legislature "expressly delineated the circumstances which allow a juvenile court to dismiss a petition," a rule allowing for dismissal in other circumstances "is inconsistent with legislative intent and hereby disapproved"].)

F. Robert F. *Does Not Conflict with Prior Precedent*

*Delila D.* states that earlier decisions of our court held that "the duty of initial inquiry in section 224.2(b) 'applies in every dependency proceeding.'" (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 975-976, quoting *Ricky R.*, *supra*, 82 Cal.App.5th at p. 678.) *Delila D.* concludes that *Robert F.* departed from that prior case law, so that is a compelling reason not to follow *Robert F.* (*Delila D.*, at pp. 975-976.) The argument is meritless.

Until *Robert F.*, no opinion of this court had ever addressed the meaning and effect of the limiting language in section 224.2(b), and no opinion of this court had considered whether section 224.2(b) applies if a child is taken into protective custody pursuant to a warrant or applies only if a child is taken into temporary custody under section 306 or 307. There thus was no contrary precedent from this court. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160 ["'it is axiomatic that cases

41

are not authority for propositions not considered'"]; *Fairbanks v. Superior Court* (2009) 46 Cal.4th 56, 64 ["a judicial decision is not authority for a point that was not actually raised and resolved"]; *Canales v. City of Alviso* (1970) 3 Cal.3d 118, 127, fn. 2 ["'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents'"].)  The only precedent contrary to *Robert F.* is *Delila D.*

G.  Robert F. *Does Not Undermine ICWA*

Finally, *Delila D.* concludes that *Robert F.*'s interpretation of section 224.2(b) "would significantly undermine the purpose of ICWA and the California statutes implementing ICWA." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 976.)  We are not persuaded.

Before Assembly Bill 3176, ICWA-related California law already exceeded the requirements of federal law.  (E.g., *In re G.C.* (2013) 216 Cal.App.4th 1391, 1400; *In re A.B.* (2008) 164 Cal.App.4th 832, 838; *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1202.)  As modified by Assembly Bill 3176, ICWA-related California law exceeds those requirements still further.  (E.g., *In re M.W.* (2020) 49 Cal.App.5th 1034, 1043-1044; Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.), as amended Apr. 11, 2018, p. 10 ["In this bill, California has a higher standard for determining if a child *may be* an Indian child and requires that further inquiry must be undertaken for those children"].)  That remains true under *Robert F.  Delila D.* does not explain how a case under which California law is more protective of Indian children,

42

families, and tribes than required by federal law could nonetheless "undermine the purpose of ICWA." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 976.) Not every disagreement about the extent to which California law exceeds federal requirements presents a conflict between undermining ICWA and furthering it.

The legislative history of Assembly Bill 3176 illustrates the point. As *Delila D.* explains, the California Tribal Families Coalition sponsored Assembly Bill 3176. (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.), as amended Apr. 11, 2018, at p. 1.) The coalition and numerous tribes supported the bill as introduced. (Assem. Com. on Human Services, Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.), as introduced Apr. 2, 2018, at p. 10.) That original version of the bill described a much more restrictive duty of inquiry than the enacted legislation as interpreted by *Robert F.* (Assem. Bill 3176 as introduced Feb. 16, 2018, § 5, pp. 17-18.) The original bill did not include the broad language stating that the affirmative and continuing duty to inquire applies to any child for whom a section 300 petition may be or has been filed, and the bill did not impose a duty to inquire that begins at initial contact. (*Id.* at p. 17.) While the bill required the court to ask each participant in a child custody proceeding about a child's Indian status, it also stated that "the duty to inquire begins once there is a reason to know that the child is an Indian child." (*Id.* at pp. 17-18.) And the bill did not expressly require initial inquiry of extended family members under any circumstances. (*Ibid.*)

If the characterization of *Robert F.* as undermining the purpose of ICWA were accurate, then the tribes themselves sponsored and supported a proposal (namely, the original version of Assembly Bill 3176) that undermined the purpose of ICWA (because it was more restrictive than *Robert F.*). That is not plausible. Rather, the tribes sponsored and supported a proposal that enhanced ICWA enforcement and exceeded federal requirements, even though it did not go as far as the version of the bill that was ultimately enacted. The disagreement between *Robert F.* and *Delila D.* is similar. Neither case undermines ICWA. They merely disagree about the extent to which California law exceeds federal requirements.

H. *The Concurring Opinion's Analysis Is Not Persuasive*

The concurring opinion disagrees with *Robert F.* and *Ja.O.* for the reasons articulated in *Delila D.* (conc. opn., *post*, at p. 1), which we have already addressed. The concurring opinion also adds a few points warranting separate treatment.

First, the concurring opinion argues that "the language and historical context of section 340" refute *Ja.O.*'s surplusage analysis (conc. opn., *post*, at pp. 5-6), but the legislative history cited by the concurring opinion actually supports our view that section 306(a)(1) does not apply to removals pursuant to protective custody warrants. To review, subdivision (c) of section 340 requires the social worker to investigate "pursuant to section 309" when the child has been taken into protective custody under section 340. (§ 340, subd. (c); *Ja.O.*, 91 Cal.App.5th at p. 680.) Section 309 imposes certain investigative duties on social workers with respect to children in temporary custody under

44

article 7 of the juvenile court law, which includes section 306 but not section 340. (§ 309, subd. (a); Welf. & Inst. Code, div. 2, pt. 1, ch. 2, art. 7.)  Thus, if children in protective custody under section 340 were in temporary custody within the meaning of section 306(a)(1), then there would be no need for section 340 to specify that the social worker must conduct a section 309 investigation.  (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 680.)  Rather, section 309 would already apply, because it applies to every child in temporary custody under section 306.  (*Ja.O.*, at p. 680.)

Former section 340 consisted solely of what is now subdivision (a), which permitted the juvenile court to issue a protective custody warrant when a dependency petition had already been filed.  (Stats. 1987, ch. 1485, § 29.)  The Legislature amended section 340 in 2017 to add both subdivision (b)—authorizing the court to issue a protective custody warrant without the filing of a dependency petition (§ 340, subd. (b))—and subdivision (c)—making section 309 applicable to children who are taken into protective custody pursuant to protective custody warrants (§ 340, subd. (c)).  (Stats. 2017, ch. 262, § 1.)  A legislative committee report on the 2017 bill explained that by enacting subdivision (c), the Legislature intended to subject children removed pursuant to protective custody warrants to the "same provisions and restrictions currently in place for a child in temporary custody."  (Sen. Com. on Judiciary, Rep. on Assem. Bill 1401, as amended Apr. 19, 2017, at p. 5.)

The concurring opinion asserts that the legislative committee report undermines *Ja.O.*'s argument concerning the interpretation of section 306(a)(1), but we are not

45

persuaded. On the contrary, the report supports *Robert F.* and *Ja.O.* and undermines *Delila D.* The report does not state that section 309 applies to children taken into custody pursuant to protective custody warrants because such children are in temporary custody under section 306(a)(1). Rather, the report takes the opposite view—it is necessary to enact a new provision making section 309 applicable. The report thus confirms the distinction between protective custody under section 340 and temporary custody under section 306.[9]

Second, the concurring opinion rejects *Ja.O.*'s claim that it makes sense to expand the duty of initial inquiry for warrantless detentions because of the time-sensitive ICWA-related requirements applicable to such detentions under section 306, subdivision (d). (Conc. opn., *post*, at pp. 3-4; see *Ja.O.*, *supra*, 91 Cal.App.5th at p. 681.) In support of its position, the concurring opinion reasons that Assembly Bill 3176 did not just add requirements to section 306—it also added new ICWA-related requirements to section

---

[9] We note that there is an additional problem with *Delila D.*'s interpretation of section 306(a)(1) and section 224.2(b). If *Delila D.* were right that section 306(a)(1) applies to children taken into protective custody pursuant to protective custody warrants, then the expanded duty of initial inquiry under section 224.2(b) would apply to all children taken into custody (with or without warrants) before the detention hearing, but it would not apply to children who are first detained by the court at the detention hearing, never having been taken into custody previously. *Delila D.* obviates the need to explain that differential treatment by arguing that because section 224.2(b) does not contain the word "only," it applies to all children regardless of whether they were taken into temporary custody under section 306 or 307. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 974.) But if *Delila D.*'s argument concerning the absence of the word "only" fails, as we argue it does (*ante*, pp. 27-29), then *Delila D.*'s interpretation of section 306(a)(1) and section 224.2(b) leads to differential treatment that is at least as hard to explain as the differential treatment under *Robert F.* and *Ja.O.*

46

319, which govern the detention of Indian children at the initial hearing. (Conc. opn., *post*, at pp. 3-4.)

It is true that Assembly Bill 3176 made changes to section 319 (and many other parts of the statutory scheme). But the point made in *Ja.O.* is that the time-sensitive requirements imposed by subdivision (d) of section 306 apply only if the "social worker takes or maintains an Indian child into temporary custody under subdivision (a)" of section 306, and that differential treatment of cases in which the child is taken into temporary custody without a warrant provides a sensible reason for treating the initial inquiry differently in such cases. (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 681.) It is irrelevant that Assembly Bill 3176 also made changes to section 319 that do not themselves support treating warrantless cases differently. *Ja.O.* never claimed that every change made by Assembly Bill 3176 supports treating warrantless cases differently.[10]

Third, the concurring opinion denies that the history of removing Indian children from their families without due process or court oversight provides a sensible reason for the BIA to recommend extended family member inquiry when warrantless, emergency

---

[10] The concurring opinion also argues that the time-sensitive requirements of subdivision (d) of section 306 apply to all children taken into custody before the detention hearing, with or without warrants, so those requirements do not support differential treatment. (Conc. opn., *post*, at p. 3.) But the argument is based entirely on *Delila D.*'s claim that children taken into protective custody pursuant to protective custody warrants are in temporary custody under section 306(a)(1). (Conc. opn., *post*, at p. 3.) The concurring opinion's argument therefore is of no consequence. If *Delila D.* is right about section 306(a)(1), then there is no differential treatment to explain. But if *Robert F.*, *Ja.O.*, and our opinion today are right about section 306(a)(1), then the requirements of subdivision (d) of section 306 apply only in warrantless cases and thus do make sense of the Legislature's decision to treat such cases differently.

47

removals occur. (Conc. opn., *post*, at pp. 7-8.) That appears to be a policy disagreement between the concurring opinion and the BIA, and perhaps between the concurring opinion and the Legislature (for following the BIA's recommendation). But the issue dividing *Robert F.* and *Delila D.* is a question of statutory interpretation. Our role is to "follow the Legislature's intent, as exhibited by the plain meaning" of the statutory language, not to pass on the wisdom or policy underlying the legislation. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632.) And as we held in *Robert F.*, the language of section 224.2(b) "is plain and therefore controls." (*Robert F.*, *supra*, 90 Cal.App.5th at p. 500.) The holdings of *Robert F.* and *Ja.O.* were not based on our own policy preferences. Rather, they were based on analysis of the statutory language, related provisions of the statutory scheme, and the legislative history, including the BIA guidelines. Now, in response to *Delila D.*'s assertion that "it simply doesn't make sense to apply different initial inquiries depending on how the child was initially removed from home" (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975), we have provided reasons (in addition to those stated in *Ja.O.*) for the BIA's recommendation and the Legislature's decision to follow it. Those reasons make sense of the BIA's recommendation and the Legislature's decision, regardless of the concurring opinion's view that the reasons are not particularly strong.

On a related point, the concurring opinion asserts that even if the history of removing Indian children without court oversight were an adequate reason for the Legislature's decision to treat warrantless removals differently, that rationale would

48

apply only until the court becomes involved at the detention hearing. (Conc. opn., *post*, at p. 8.) But there is at least one sensible reason for the Legislature's decision to make the expanded duty of initial inquiry last throughout the proceedings instead of terminating at the detention hearing: If the duty ended at the detention hearing, then it would be virtually impossible for courts to enforce it. Thus, by creating an expanded duty of initial inquiry that both applies if a child is taken into temporary custody without a warrant and lasts throughout the dependency case, the Legislature followed the BIA guidelines' recommendation, did justice to the heightened concerns (including parental absence) that warrantless removals pose, and made the duty susceptible of judicial enforcement.

Fourth, the concurring opinion asserts that the first sentence of section 224.2(b) does not limit or define the initial inquiry. (Conc. opn., *post*, at p. 6.) Instead, the concurring opinion claims that the first sentence "is intended to frontload a social worker's investigative duties in cases where the child is removed from home prior to the filing of a dependency petition." (*Id.* at pp. 6-7.) To the extent that means the first sentence merely tells the child welfare department *when* to begin its inquiry, the interpretation is not reasonable. The first sentence of section 224.2(b) does not contain any language related to timing. The sentence does not, for instance, state that the child welfare department must inquire *when* or *as soon as* the child is placed into the temporary custody of the department under section 306 or that the department must inquire of extended family members *before* the initial petition hearing or detention hearing. Nor does the sentence contain language similar to subdivision (c) of section

224.2, which requires the court to inquire "[a]t the first appearance in court of each party." And as already explained, subdivision (a) of section 224.2 does state when the duty to inquire arises—it "begins with the initial contact." For all of these reasons, the plain language of the statute does not support the concurring opinion's apparent suggestion that the purpose of the first sentence of section 224.2(b) is merely to specify the timing of ("frontload") the social worker's duty of inquiry.

For all of the foregoing reasons, we conclude that *Robert F.* correctly interpreted section 224.2(b). Neither *Delila D.* nor the concurring opinion persuades us to the contrary. DPSS did not take Andres into temporary custody pursuant to section 306. Accordingly, the expanded duty of initial inquiry under section 224.2(b) did not apply.

## DISPOSITION

The dispositional order is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ
J.

I concur:

FIELDS
J.

50

[*In re Andres R.*, E079972]

Slough, J., Concurring.

I write separately because I do not agree with the majority's interpretation of the ICWA[1] duty of initial inquiry described in Welfare and Institutions Code section 224.2, subdivision (b) (section 224.2(b)) (unlabeled statutory citations refer to this code). Following our court's recent holdings in *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 and *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572 (*Ja.O.*), my colleagues conclude the provision, which requires social workers to ask available extended family members whether the child "is or may be an Indian child" within the meaning of ICWA, applies in only those cases which begin with a warrantless removal before the initial petition hearing. (Maj. opn., *ante*, at p. 2.) For the reasons articulated in *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*), I respectfully disagree and continue to construe the inquiry described in section 224.2(b) as applying any time a child is removed from home.

Section 224.2(b) was enacted as part of Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (A.B. 3176), which added several new ICWA-related provisions to the Welfare and Institutions Code that became effective January 1, 2019. (Stats. 2018, ch. 833, §§ 1-39.) Our Legislature's dual purposes in enacting A.B. 3176 were to (1) increase tribes' opportunity to be involved in child custody cases involving Indian children and (2) bring California law into compliance with 2016 federal ICWA regulations imposing minimum

---

[1] Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).

1

requirements to state court emergency proceedings involving Indian children. (*In re S.S.* (2023) 90 Cal.App.5th 694, 699-702; Cal. Health and Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.) prepared for Governor Brown (Aug. 31, 2018 & Sept. 4, 2018) pp. 1-2 (Enrolled Bill Report).)

To achieve these goals, A.B. 3176 imposed new ICWA-related substantive requirements for the temporary custody and detention of Indian children and expanded the initial inquiry to include "extended family members, others who have an interest in the child, and the party reporting child abuse or neglect." (§ 224.2(b); see also §§ 306, 319; Stats. 2018, ch. 833, §§ 1-39.) After A.B. 3176 went into effect, the Judicial Council revised rule 5.481 of the California Rules of Court to implement the expanded duty of initial inquiry. That rule now provides that "[t]he party seeking a foster-care placement, . . . termination of parental rights, preadoptive placement, or adoption must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child." (Cal. Rules of Court, rule 5.481(a)(1) (rule 5.481).)

In my view, section 224.2(b) and rule 5.481 create a clear mandate: where a child has been removed from home or is at risk of being removed from home, the social worker must ask available extended family members whether the child is or may be an Indian child. Under the majority's view, however, the inquiry described in section 224.2(b) applies only in cases where the child was initially removed from home without a warrant.

2

The majority reasons that it makes sense to impose such a dichotomy in dependency proceedings "because warrantless detentions trigger [the] time-sensitive ICWA-related requirements" in section 306, subdivision (d) that are "otherwise inapplicable" to children removed by protective custody warrant. (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 681.) Thus, "confirming whether [a child removed without a warrant] is an Indian child is particularly urgent." (*Ibid.*)

The time-sensitive requirement in section 306, subdivision (d) to which *Ja.O.* refers requires social workers to immediately notify the tribe if they know or have reason to believe the child they have taken into temporary custody falls within the tribe's exclusive jurisdiction under ICWA. (§ 306, subd. (d).) I disagree that this requirement does not apply to children removed by warrant and held in the department's custody before the detention hearing. As *Delila D.* explained, such children fall within section 306, subdivision (a)(1) as soon as they are delivered to the social worker upon execution of the protective custody warrant. (See *Delila D.*, *supra*, 93 Cal.App.5th at pp. 971-972 [concluding children removed by warrant are held in the department's temporary custody leading up to the detention hearing].) So, section 306, subdivision (d) *does* apply to children removed by warrant and *doesn't* justify importing different treatment into our interpretation of section 224.2(b).

Moreover, A.B. 3176 did not add new ICWA-related requirements to section 306 alone. It also added ICWA-related provisions to section 319, which governs the detention of children at the initial petition hearing. (Stats. 2018, ch. 833, § 22.) For example, as

3

amended, section 319 provides that if a court "knows or there is reason to know the child is an Indian child," it may not detain the child at the initial petition hearing unless it "finds that detention is necessary to prevent imminent physical damage or harm" and "state[s] on the record the facts supporting this finding." (§ 319, subd. (d); Stats. 2018, ch. 833, § 22.) As *Delila D.* explained, because section 319 governs all detention hearings, even those involving children who were removed by warrant, A.B. 3176's amendments to that provision will apply if there is reason to know a child removed by warrant is an Indian child. (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 970-971.)

My colleagues characterize this reasoning from *Delila D.* as unsound because, in their view, section 315 does not provide the statutory directive to hold a detention hearing for a child removed by warrant, but section 290.1 does. (Maj. opn., *ante*, at pp. 26-27.) I disagree. Section 290.1 is a notice provision, as indicated by its placement in article 5.5 of the juvenile court law, which governs "Notices in Dependent Child Proceedings." (Welf. & Inst. Code, div. 2, pt. 1, ch. 2, art. 5.5.)[2] The provision does not apply to courts and does not direct courts to hold a detention hearing. Rather, it applies to social workers and sets out the steps they must take to provide notice of the hearing. (§ 290.1.) Because section 315 is the *only* statutory directive requiring the court to hold a detention hearing, it necessarily applies to both categories of children. (§ 315 [providing that if a child has been taken into custody and not released to a parent or guardian, "*the juvenile court* shall

_____

[2] Unlabeled citations to articles refer to the juvenile court law. (Welf. & Inst. Code, div. 2, pt. 1, ch. 2.)

4

hold a hearing (which shall be referred to as a 'detention hearing') to determine whether the child shall be further detained"], italics added.)

For related reasons, I also disagree with the surplusage argument articulated in *Ja.O.* According to *Ja.O.*, "[i]f subdivision (a)(1) of section 306 referred to a child taken into protective custody under section 340, then there would be no need to specify [in section 340, subdivision (c)] that the social worker conduct a section 309 investigation." (*Ja.O.*, *supra*, 91 Cal.App.5th at p. 680.) I believe the language and historical context of section 340 demonstrate that the reference to section 309 is not surplusage but instead functions as a necessary cross-reference to the temporary custody and detention provisions in article 7.

To explain, the provision at issue—section 340, subdivision (c)—was enacted by Assembly Bill No. 1401, an amendment that authorized courts to issue protective custody warrants before a dependency petition is filed on behalf of the child. (§ 340, subd. (b); stats. 2017, ch. 262 (A.B. 1401), § 1.) As originally enacted, section 340 authorized courts to issue a protective custody warrant only after the filing of the petition. (Former § 340.) For that reason, section 340 is located in article 8, which is entitled "Commencement of Proceedings" and governs the aspects of proceedings related to the filing of dependency petitions. (Welf. & Inst. Code, div. 2, pt. 1, ch. 2, art. 8.)

Before the enactment of A.B. 1401, the only way a social worker could maintain custody of a child prior to filing a dependency petition on the child's behalf was if the social worker believed removal was necessary to protect the child from immediate

5

danger. (§§ 305, 305.6, 306, subd. (a)(2).) A.B. 1401 thus added an additional circumstance under which a social worker is authorized to maintain custody of a child prior to the filing of a dependency petition. (§ 340, subd. (b); Stats. 2017, ch. 262 (A.B. 1401), § 1.)

The legislative history of that amendment shows, in conferring this new authority on courts, the Legislature wanted to ensure that children removed by warrant prior to the filing of a dependency petition were subject to the "same provisions and restraints currently in place for a child in temporary custody." (Sen. Jud. Com., Rep. on Assem. Bill No. 1401, Apr. 19, 2017, p. 5.) One way to make that intention clear would be to add A.B. 1401 to article 7. Another option would be to add A.B. 1401 to the pre-existing warrant provision in article 8 and include cross-references to article 7 to make clear that children removed by warrant are subject to the same protections as children removed under exigent circumstances.

I believe this is precisely what the Legislature had in mind when it included a reference to section 309 in section 340, subdivision (c). By referencing section 309—and by including the phrase "delivered to the social worker" (which I interpret as a reference to section 306, subdivision (a)(1))—the Legislature was conveying its intent that children removed by warrant be subject to the provisions of article 7. For all these reasons, I think the majority is wrong to interpret the first sentence of section 224.2(b) as imposing a condition or limitation on the inquiry described in the second sentence. Given the substantive changes A.B. 3176 made to article 7, I believe first the sentence is intended to

6

frontload a social worker's investigative duties in cases where the child is removed from home prior to the filing of a dependency petition. The need to determine whether a child who may be detained at the initial petition hearing is an Indian child or falls under a tribe's exclusive jurisdiction is as urgent for children removed by warrant as it is for children removed under exigent circumstances.

Moreover, that need does not diminish in urgency once a case moves past the initial petition hearing stage. If anything, it becomes even more important to determine whether ICWA applies once a child has been adjudged a dependent and removed from parental custody at disposition, as the possibility of permanently separating the child from their family is more concrete than at the initial petition stage. As *Delila D.* pointed out, the majority's holding leads to the irrational result that the manner of initial removal dictates the scope of the initial inquiry throughout the entire proceeding. (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975.) Even if there were a rationale for treating the two categories of children differently for inquiry purposes before the detention hearing, the majority does not explain why that rationale would continue to matter once a case progresses beyond the temporary custody and detention stage.

The majority opinion reasons that the disturbing historical examples of social workers removing Native American children from their families without "any kind of court involvement or oversight provides a sensible reason to recommend a more expansive ICWA inquiry when today's social workers remove children without court authorization." (Maj. opn., *ante*, at p. 38.) Because the current legal landscape is not the

7

same as it was pre-ICWA, and because the temporary custody and detention provisions in article 7 protect children from removal without court oversight, I disagree. But even if I did find this rationale convincing, it would apply only until the detention hearing, at which point the court does become involved. From that point forward, there is no reason to treat children removed without a warrant differently for ICWA purposes.

Indeed, pre-detention circumstances are irrelevant under rule 5.481, which requires social workers to make the initial inquiry of extended family members *whenever* they seek to remove the child from home during a dependency proceeding. (Rule 5.481(a)(1).) The majority would disapprove of this rule of court to the extent it is inconsistent with their view of section 224.2(b)—that is, to the extent it requires inquiry of extended family members in cases where the child was not initially removed without a warrant. (Maj. opn., *ante*, at p. 41.)

But as I hope my reasoning shows, rule 5.481 is easily harmonized with section 224.2(b). The first sentence of section 224.2(b) provides that the obligation to inquire of available extended family members arises as soon as a child is placed into temporary custody (i.e., *before* the proceeding commences), and rule 5.481 makes clear that obligation also applies to any child removed *during* the proceeding.

I therefore conclude that the department is obligated to ask available extended family members whether Andres is or may be an Indian child. However, because this case is ongoing, I would not reverse the juvenile court's finding that ICWA does not apply but would instead affirm, as the majority does, and direct the department to

8

discharge its duty going forward. (*In re S.H.* (2022) 82 Cal.App.5th 166, 179 ["So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the Agency and the juvenile court have an adequate opportunity to fulfill those statutory duties"]; accord, *In re Dominick D.* (2022) 82 Cal.App.5th 560, 566.)

SLOUGH
Acting P. J.

9